*60 ORDER DENYING APPEAL
DAVID D. SHAW, Chief Judge.
This matter came before the Court upon an appeal by Petitioner of an August 16, 2013 decision by the Tribal Council to approve the Enrollment Committee’s recommendation to remove Petitioner from membership in the Confederated Tribes of the Grand Ronde Community of Oregon (“the Tribe” or “CTGR”).
Oral arguments were heard on this matter on December 3, 2014. Petitioner appeared through its counsel, Joe Sexton. Respondent appeared through its counsel, Tribal Attorney Deneen Aubertin Keller.

I. Introduction

The Petition is denied. The related analysis of the parties’ claims, defenses, and arguments are discussed further here *61 in. However, prior to engaging in the analysis, the Court is compelled to comment that this judicial opinion speaks only to a legal proceeding and does not intend to unnecessarily comment on the personal issue of the Petitioner’s sense of self and personal identity.

Procedural Background

Petitioner has been a member of the Tribe for over twenty-seven years. Petitioner’s history includes a period of slightly over three months when she was dual enrolled with CTGR and the Confederated Tribes of the Siletz Indians of Oregon (“Siletz”).
The Tribal Constitution prohibits an individual from qualifying for membership in the Tribe if the person is also a member of another tribe. Tribal Const. Art. V, Sections 1, 2. The Tribal Constitution' authorizes the creation of a Tribal ordinance to address in part a “correction of the tribal roll.” Tribal Const. Art. V, Section 3. The Tribal Constitution also authorizes the creation of a Tribal ordinance governing involuntary loss of membership and limits the reason for such loss to a “failure to meet the requirements set forth for membership in this Constitution.” Tribal Const. Art. V, Section 5.
In April 2013, Petitioner was notified by letter that an enrollment audit indicated she was enrolled with Siletz at the time she was enrolled with CTGR. Record Ex. 45. The enrollment audit was conducted by a third party hired by the Tribe to act as its authorized agent. The April 2013 letter states the Tribal Enrollment Department is recommending Petitioner’s removal from Tribal membership due to her dual enrollment. Id. The same letter notifies Petitioner of a right to a hearing before the Enrollment Committee. Id. Petitioner timely requested an Enrollment Committee hearing. Record Ex. 12.
Petitioner’s Enrollment Committee hearing was initially established for May 3, 2013. Record Ex. 9. Petitioner requested an extension of her May 3rd hearing date and also filed with this Court an Emergency Request for Enrollment File and/or Stay in order to review her enrollment file. Petitioner received an order from the Tribal Court to review her enrollment file on May 29, 2013. The Enrollment Committee reset her May 3rd hearing until May 30, 2013. Record Ex. 52.
The Enrollment Committee consists of appointed Tribal elders that do not hold themselves out as practicing attorneys. Petitioner was represented by bar-licensed attorneys during the Enrollment Committee hearing process. No publicly available information and no written information was available to Petitioner, or Petitioner’s bar-licensed attorneys, on the process to be used at the Enrollment Committee or Tribal Council hearings[1] in regards to (i) how traditional “evidence” (as this term would be used by lawyers in a judicial setting) could be presented; (ii) how witnesses could be compelled to testify (including witnesses that are employees of the Tribe[2]); (iii) the standard of proof or burden of persuasion and the party bear- *62 mg the same; (iv) and the nature of any discovery[3] rights or process. Petitioner’s attorney raised complaints regarding items (i)-(iv) throughout the Tribal administrative process. In response to some of these complaints, Petitioner received extensions of deadlines and extensions of time for its administrative presentations.
Notwithstanding the issues identified in (i)-(iv) above, the Tribe repeatedly informed Petitioner and Petitioner’s attorneys that they would be provided the opportunity to present information they wanted at the Enrollment Committee, and that the issue for consideration was the dual enrollment of Petitioner with the Si-letz Tribe.
Petitioner submitted a relatively-large amount of documentary evidence into the record at the administrative level, and was permitted a significant amount of time for a presentation to Tribal Council after the Enrollment Committee’s contingent disen-rollment decision.
Petitioner was represented by legal counsel at the May 30th Enrollment Committee hearing. Petitioner also submitted legal briefing and documentary evidence at the May 30th hearing. Record Ex. 51. After objecting to the use of some documents used at the May 30th hearing, Petitioner was subsequently informed by the Committee of her opportunity to submit a limited written response to three documents that were submitted by Enrollment Department staff to the Enrollment Committee at the May 30, 2013 hearing. Record Ex. 54. Counsel for Petitioner subsequently sent a written request to the Enrollment Committee requesting that the disenrollment process for Petitioner be halted upon the basis that an unauthorized person wap present during the Committee hearing, and also upon the basis that members of the Enrollment Department provided evidence to the Committee outside the presence of Petitioner. Record Ex. 55. In response, on June 7, 2013 Petitioner was informed that she may have a rehearing before the Committee due to the presence of an unauthorized person at her May 30th hearing.
Petitioner’s requested rehearing with the Enrollment Committee occurred on July 10, 2013, at which she was represented by counsel. Record Ex. 64. Petitioner was notified two days later of the Enrollment Committee’s recommendation to the Tribal Council of disenrollment and that the Tribal Council would act on this recommendation on August 14, 2013. Record Ex. 66. Petitioner’s attorney submitted written arguments to the Tribal Council on August 2, 2013. Record Ex. 72. The Tribal Council met to discuss in part the recommend disenrollment of Petitioner on August 14, 2013 and August 16, 2013, and Petitioner represented herself before the Tribal Council on these dates. Record Ex. 75.
At the Tribal Council presentation, Petitioner neither questioned the involvement of the Tribal Chairman, nor requested his recusal from the discussion or voting on the Enrollment Committee recommended action of disenrollment. Record Ex. 76. The Tribal Council voted on August 16, 2013 to dis-enroll Petitioner by a 5-4 vote, with the Chairman casting the deciding vote. Id.

Material Facts

Between November 25 and December 3, 1985, Petitioner submitted an application *63 for membership in the Tribe and explicitly-stated in writing that she was also a then-current member of Siletz. Record Ex. 1. Previously, Petitioner had submitted paperwork to the Siletz on November 20, 1985 referencing a change in her membership status. Record Ex. 49. On January 30, 1986, a Tribal Enrollment employee notified Petitioner that action on her membership application would occur in three to five weeks and recommended she obtain relinquishment forms from Siletz. Record Ex. 14. On February 24, 1986, Petitioner was enrolled with CTGR. Record Ex. 16. On February 26, 1986 the same Tribal Enrollment employee sent a letter to Petitioner apologizing for failing to notify her of the Tribal Council meeting where her membership application was acted on and approved, and requesting evidence of her relinquishment from Siletz as soon as possible. Record Ex. 17.
On March 7, 1986 the Enrollment Manager for Siletz contacted the same Tribal Enrollment employee to confirm Petitioner’s enrollment with CTGR and the need to commence Petitioner’s disenrollment from Siletz. Record Ex. 18. The same Tribal Enrollment employee confirmed by letter dated March 11, 1986 Petitioner’s enrollment with CTGR. Record Ex. 19. Through the same March 11, 1986 letter, the Tribal Employee stated “[i]n the future, I will not present a client for enrollment approval unless they have all ready [sic] completed the relinquishment procedure form their present tribe. Our enrollment ordinance states that Grand Ronde membership is open to ‘all persons who are not enrolled as members of another federally recognized tribe, etc...’ My previous instructions in this matter were incurred. In the future I must follow the enrollment ordinance requirements.”
On May 9,1986 the Enrollment Committee met to discuss Petitioner’s dual enrollment. Record Ex. 23. The Enrollment Committee instructed the same Enrollment employee to send Petitioner a letter informing her of notice of her “dismember-ship” at the Tribe if she failed to relinquish membership with Siletz within 30 days and that a failure to respond would result in the Enrollment Committed recommending to Tribal Council her removal from the Tribal membership roll. Id.
On May 28, 1986 Siletz notified Petitioner of her proposed removal from Siletz membership within 30 days if she did not produce evidence to the Siletz Tribal Council on why removal should not occur. Record Ex. 22. This same letter referred to how both Siletz and CTGR law prohibited dual membership, an allegation of Petitioner’s knowledge of the same, and that she must relinquish from one of these tribes within 30 days. Id.
On June 2, 1986, Petitioner sent a letter to Siletz stating “[a] slight misunderstanding must of happened in my request for consideration of enrollment in the Grand Ronde Tribe. It was [my] desire to obtain my records for my childrens [sic] enrollment, and at a later time I would follow. In my conversation with Grant Ronde I spoke of this, and was assured that the process of my enrollment would not take place until I relinquished my enrollment from the Siletz Tribe. Of which to this date I have not done ... at this time I plan to continue as a Siletz member. Please let Grand Ronde know of my decision, and please accept my apology for the inconvenience.” Record Ex. 25. On June 4, 1986, the same Tribal Enrollment employee sent Petitioner a letter stating that Petitioner must take relinquishment action at Siletz within 30 days due to Tribal law prohibiting dual enrollment. Record Ex. 23. On June 6,1986 the Siletz Enrollment Manager sent a letter to the Tribal Enrollment employee requesting a copy of the *64 Grand Ronde resolution relinquishing Petitioner’s CTGR membership. Record Ex. 25. Accompanying this June 6, 1986 Siletz correspondence was a copy of Petitioner’s June 2,1986 letter to Siletz.
On July 8,1986, Petitioner was informed by Siletz that on June 14, 1986 the Siletz Tribal Council met and adopted a resolution removing her from membership due to dual membership and that she had been provided enough time to relinquish from either Siletz of CTR. Record Ex. 26, Record Ex. 46.

Legal analysis and discussion

The Court’s role in this matter is limited to an analysis of whether the administrative decision below was arbitrary and capricious, and also if the decision violated the rights in the Tribal Constitution. Enrollment Ordinance, Section (d)(4)(H).[4]
Petitioner argues as a fundamental point of its advocacy that the disenrollment action is unconstitutional. This argument relies on the claim that the Tribal Constitution provides only limited grounds for disenrollment, these grounds are not applicable here, and the Petitioner has already met and been accepted into the Tribe for many years. Specifically, Petitioner advocates that the language of Tribal Const., Art. V, Section 5 stating that the reasons for loss of membership “shall be limited exclusively to failure to meet the requirements set forth for membership in this Constitution” cannot apply membership standards or material facts affecting qualification for membership that existed prior to a person becoming a member in the Tribe. In response, the Tribe advocates that the Constitution provides authority for correction of a member enrolled by error, the grounds for this authority apply to Petitioner, and a person cannot achieve a vested enrollment status if the enrollment is based on error. The Tribe further argues that it has the sovereign authority to make a policy choice to forego providing conditional steps to allow correction or repair of a prior enrollment error.
Implicit in this debate between the parties is the scope and extent of the following questions: (i) what a lawful “correction” of an “enrollment error” can be in comparison to an unauthorized disenrollment action; (ii) what constitutes a sufficient relinquishment of membership in another tribe when an allegation of dual enrollment is present; and (iii), the degree with which the Tribe could take perceived conflicting positions in its administrative enrollment process on the same individual’s enrollment.
As a general matter, linguistic tension between “an action to correct a prior enrollment error” and “a disenrollment action” theoretically exists. And there may in time be a case before this Court where the facts stretch the linguistic tether of a claimed action to correct a prior enrollment error so far as to snap it from its Constitutional moorings. However, despite the passage of approximately 27 years, the facts of this case do not present such a situation. The actions below are reasonably viewed as correcting an error of the Petitioner being dual enrolled at the time of enrollment at CTGR, and as such the actions of the relevant Tribal parties are authorized by the Constitution and *65 Tribal Ordinance. This holding is buttressed by the contemporaneous acknowl-edgement of the Tribal actor involved with the CTGR enrollment of Petitioner that her "... previous instructions [on how and when Petitioner could address her dual enrollment while being processed and approved for Tribal enrollment] were incorrect. In the future I must follow the enrollment ordinance requirements.” Record Ex. 19. Upon similar grounds, the Tribal Ordinance is Constitutional, and the actions of the Tribal actors in relation to the Tribal Ordinance to process Petitioner as a proposed disenrollment based on enrollment in error are legally authorized.
Petitioner next claims that an audit of enrollment files, conducted by a third party agent of the Tribe, is illegal. The results of this audit included the conclusion that Petitioner was dually enrolled at the time of enrollment with the Tribe. This claim is denied. The Tribe is within its authority to both conduct an audit of enrollment files under its authority to correct errors and administer the Tribal enrollment standards, and also to hire agents and representatives to act on its behalf to perform these governmental functions.
Petitioner also claims that the disenrollment action is unauthorized pursuant to the equitable doctrine of laches. In general, laches acts as an equitable defense, due to the passage of time and unreasonable prejudice to the non-moving party, to an equitable claim brought against it by the moving party. The relief from a successful defense of laches is thus usually limited to equitable relief (e.g. an injunction) rather than legal relief (e.g. damages). This argument fails for three reasons. First, the narrow waiver of sovereign immunity provided for a judicial review of an enrollment appeal does not include explicit language permitting a defense of laches. Second, the respondent’s status as a Tribal government provides it with a shield from a defense of laches under the longstanding legal principal that a government should not be bound by lach-es when enforcing its rights. Here, the Tribe is enforcing its rights to both administer and apply the Tribal enrollment standards and to correct any enrollment error. See, United States v. Summerlin, 310 U.S. 414, 416, 60 S.Ct. 1019, 84 L.Ed. 1283 (1940); Chesapeake & Delaware Canal Co. v. United States, 250 U.S. 123, 125, 39 S.Ct. 407, 63 L.Ed. 889 (1919); Chevron, USA Inc. v. United States, 705 F.2d 1487, 1491 (9th Cir.1983); Utah Power & Light Co. v. United States, 243 U.S. 389, 409, 37 S.Ct. 387, 61 L.Ed. 791 (1917). Third, the CTGR action to remove Petitioner from membership is not an equitable claim.
On a related point to the doctrine of laches, Petitioner alleges equitable es-toppel applies through the prior words and actions of the Tribal government in approving her Tribal membership and addressing relinquishment of her Siletz membership to prohibit the Tribal disen-rollment. This claim also fails for two reasons. First, when the government is the party to which estoppel is asserted against, separate and stronger standards apply to the legal analysis. See, Kalk v. Mille Lacs Band of Ojibwe Corporate Comm’n, Case No. 03 APP 03, — Am. Tribal Law-,-, 2004 WL 5746060 at *3 (Mille Lacs Ct.App. Sept. 16, 2004) citing Heckler v. Cmty. Health Services, 467 U.S. 51, 60, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984). Second, when the government is the party to which equitable estoppel is claimed to apply, the government’s actions must rise beyond mere negligence, the government’s actions must constitute affirmative misconduct, and the imposition of estoppel must not harm the public interest. Purcell v. United States, 1 F.3d 932, 939 (9th Cir.1993) (citations omitted). Affir- *66 raative misconduct is defined as a deliberate lie or a pattern of false promises. So-cop-Gonzalez v. INS, 272 F.3d 1176, 1184 (9th Cir.2001) (en banc). Affirmative misconduct is further defined as more than negligent conduct or misinformation. See, Sulit v. Schiltgen, 213 F.3d 449, 454 (9th Cir.2000); Keener v. E. Associated Coal Corp., 954 F.2d 209, 214 n. 6 (4th Cir.1992). Here, the historical actions of the Tribal representatives in addressing Petitioner’s enrollment are most reasonably categorized as negligent conduct or misinformation.
Moving to the strongest arguments of Petitioner, the Court addresses first the claim that the decision below was arbitrary and capricious, and then that the process used below violated the procedural due process rights guaranteed by the Tribal Constitution. These two arguments address first the factual basis for the decision below and then the process used in reaching the decision.
This Court has held that a decision is arbitrary and capricious if it runs contrary to the evidence or is “so implausible that it could not be ascribed to a difference in view.” In the matter of Reyn Leno, 2 Am. Tribal Law 89, 95 (Grand Ronde Tribal Ct.2000) (citing Motor Vehicle Mfrs. Ass’n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). Stated alternatively, there must be a rational connection between the facts and the decision made to insulate the decision from being arbitrary and capricious. See, Brandon v. Tribal Council for the Confederated Tribes of Grand Ronde, 18 ILR 6139, 6140 (1991).
Application of the arbitrary and capricious standard prohibits the Court from substituting its own decision for that of the decision-maker below. Instead, the Court is restricted to only determine if something exists in the administrative record that could rationally connect the facts to the decision. This is a steep barrier to overcome for any petitioner—and such a record exists here.
Petitioner advocates without dispute that as of time of her dual enrollment, the Siletz and CTGR were operating under different capacities and experience with enrollment matters, and modern conveniences of email, faxes, cell phones, and the internet did not exist to assist with coordination and timely communication. Despite this historical truth, the record below establishes that the Tribe informed Petitioner that she needed to timely relinquish enrollment from Siletz in order to have a valid Grand Ronde enrollment. Record Ex. 23. Tribal relinquishment exists refers to a voluntary, intentional action by an individual to request and follow through on giving up membership. Enrollment Ordinance, Section (h). In contrast, Tribal disenrollment is an action taken by a Tribal government primarily without the consent or initial intent of the individual to remove the individual from membership. See, Enrollment Ordinance, Section (i). Relinquishment did not occur and Siletz took action to dis-enroll Petitioner from its membership based on dual enrollment. Moreover, disenrollment with Siletz occurred after Petitioner informed Siletz in writing that she did not initially intend to enroll in the CTGR, and that as of June 2, 1986 “... I plan to continue as a Siletz member”. Record Ex. 25 (emphasis added). Thus, to the extent Petitioner advocates that she met the instructions of the Tribe to preserve her Tribal enrollment, the decision makers below did not act in an arbitrary and capricious manner in choosing to view either the lack of Siletz relinquishment as a material basis for the Tribal disenrollment decision and/or Petitioner’s Record Ex. 25 letter as terminat *67 ing any ability to maintain Tribal membership while dual enrolled at Siletz.[5]
Turning to the procedure followed below, it is uncontroverted that the process used below fell short of a full judicial hearing, perceived imperfections occurred, and Petitioner’s counsel had to overcome some obstacles to making its presentation. However, these issues do not in and of themselves constitute a failure to provide the minimum due process obligations mandated by Tribal law. Tribal Constitution, Article III, Section 3(k).
State and federal courts have long recognized that due process under the Indian Civil Rights Act (“ICRA”) is interpreted and applied with “due regard for the historical, governmental and cultural values of an Indian tribe,” and this concept is “not always given the same meaning as they have [it has] ... under the United States Constitution.” Tom v. Sutton, 533 F.2d 1101, 1105 n. 5 (9th Cir.1976); see also, McCurdy v. Steele, 353 F.Supp. 629 (D.Utah 1973). Thus, these same non-tribal courts recognize and uphold a reluctance to apply the due process requirements of ICRA in a manner that would “significantly impair a tribal practice or alter a custom firmly embedded in Indian culture.” Hewlett v. Salish and Kootenai Tribes, 529 F.2d 233, 238 (9th Cir.1976) see also, Synowski v. Confederated Tribes of Grand Ronde, 4 Am. Tribal Law 122 (Grand Ronde Tribal Ct.App.2003); Crowe v. Eastern Band of Cherokee Indians, Inc., 506 F.2d 1231 (4th Cir.1974); Wounded Head v. Tribal Council of Oglala Sioux Tribe of Pine Ridge Reservation, 507 F.2d 1079 (8th Cir.1975).
Due in part to a more robust experience and awareness of tribal culture and history, tribal courts generally show greater deference to Native values than a state or federal court.[6] As stated by the Colville Tribal Court of Appeals, “statutory due process under the Indian Civil Rights Act and Colville Tribal Civil Rights Act is not coextensive with constitutional due process ... Tribal values must always be the background to which those standards are applied.” Seymour v. Colville Confederated Tribes, AP 94-004 (3 CCAR 11) at n. 5, Due process requires, at its essence, notice and an opportunity to comment. Goss v. Lopez, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). A determination that these requirements have been satisfied must be conducted in light of practical considerations. As noted by this Court, “interpretations and applications of the Due Process Clause are ‘intensely practical matters and the very nature of due process negates any concept of inflexible procedures.’ ” In the Matter of Reyn Leno, Conf. Tribes of Grand Ronde Tribal Ct., 27 ILR 6213, 6215, 2 Am. Tribal Law 89 (2000) (citing Goss v. Lopez at 738). Within the context of tribal governments, this “flexibility already inherent in due process generally, takes on greater meaning.” Id. at 6216.
With regard to notice, the Ninth Circuit has held that “[d]ue process only requires notice that gives sufficient detail to allow an opposing party to prepare his defense.” Barnes v. Healy, 980 F.2d 572, 579 (9th Cir.1992). In evaluating the sufficiency of notice, a court may consider the legal sophistication and experience of the recipients of the notice, including whether *68 legal counsel represents the recipient. Bliek v. Palmer, 102 F.3d 1472, 1475 (8th Cir.1997); see also, Thomas v. Colville Confederated Tribes, AP90-12424-12428 (1 CTCR 48, 18 ILR 6126) (noting that due process rights had been violated where the court did not provide greater latitude and deference to a pro se defendant).[7]
Here, the Tribe has exercised its sovereign discretion to establish an enrollment process where an initial identification of an error in a person’s membership status can be appealed to an Enrollment Committee of non-lawyer Tribal elders. No doubt should exist that Native culture involves the presence of the “talking circle” and its non-linear communication style and holistic approach to discussing and analyzing issues. This approach and form of analysis by its very nature differs from a nonNative analysis and approach. This approach also differs from a pure legal analysis of firmly designated and regimented standards for identifying issues, conducting pre-hearing formalized discovery of information from the opposing party, presenting information to the decision-maker, and conducting direct and cross-examination of “witnesses” or key individuals.
During the administrative process below, Petitioner and her counsel were provided numerous opportunities to present information.[8] Petitioner and her counsel knew the reason why she was proposed for disenrollment, and the evidentiary basis for why the Tribe believed she was dual enrolled. Petitioner and her counsel knew they had to prove either why she was not dual enrolled or why this dual enrollment otherwise did not dictate removal from Tribal enrollment. However, Petitioner was not provided with an explicit statement of the legal concept of the “burden of proof.” Petitioner was also not provided with a formalized process or standard for how Tribal representatives could be interviewed in advance or called as a witness.[9] When considered in light of the totality of the process and mitigated measures of additional opportunities and extensions of time and the skill and the efforts of Petitioner’s counsel, these perceived shortcomings to the process below did not rise to the level of legally fatal Tribal due process.
In a non-Native setting due process also includes the additional element of an impartial decision maker. This Court holds that an impartial decision maker is also part of Tribal due process, but the type of “impartiality” (or stated alternatively, the level of alleged or actual bias) is highly fact-specific and falls short of what would be required in a non-Native setting. Native communities are by their very nature insular and interconnected in a manner and degree that does not exist outside of Indian country. Thus, an impartial decision maker under Tribal due process does not require the absence of any relationship or shared history. To hold otherwise would establish an impractical (if not impossible) standard that would eliminate the ability to have any review body in a Native community. Moreover, when one of the decision makers involved holds a position of status, or is a public official, or *69 has a relatively long-standing history of involvement in the Tribal system this decision maker cannot be judged as fatally biased due to the mere presence of any type of historical event of theoretical bias. Instead, the specific circumstances of the event or relationship with the decision maker and the party on review must be more thoroughly established.
Here, the Tribal Chairperson cast the deciding vote (due to a 4-4 deadlock of the rest of the Tribal Council) when Petitioner appealed the Enrollment Committee’s recommendation of disenrollment. The record establishes that Petitioner did not request recusal of the Tribal Chairperson from the discussion or vote on her appeal to the Tribal Council, or otherwise mention him in any manner. During the same Tribal Council meeting where Petitioner’s appeal was heard, the Tribal Chair also cast votes to affirm the Enrollment Committee’s recommendation of removal fi’om Tribal membership for more than one individual with the same last name as the Chairperson and that are otherwise identified as his family. Record Ex. 74. The alleged bias of the Tribal Chairperson, as referenced by Petitioner’s counsel, is that a public record exists of a lawsuit filed by the Petitioner against the Chairperson approximately fourteen years prior. No allegation or discussion exists of how the historical lawsuit was resolved, if any facts or liability or damages were adjudicated, or anything other than the mere fact that a lawsuit was filed against a prominent person with a long, involved history with the Tribe and Tribal community, and that this lawsuit occurred approximately fourteen years prior to the event at issue. Under the totality of these facts and context, due process has been met and a sufficient impartial decision maker under Tribal law exists.
For the reasons stated herein, the appeal is DENIED.

. This comment is limited to the specific portion of a Tribal Council hearing that functions under the Tribal Enrollment Ordinance as a forum for a party to appeal a disenrollment recommendation from the Enrollment Committee.

. Petitioner’s attorneys (and all state-bar licensed attorneys) remain bound through their professional ethics to avoid contacting certain employees and representatives of an opposing party when the opposing party is represented by counsel. See, Oregon State Bar Rule 4.2 of Professional Conduct; see also Oregon State Bar Ethics Opinions 2005-80 and 2005-152 applying RPC 4.2 to corporate and governmental employees (respectively).

. The Court uses the term "discovery” to refer to the formal process codified in legal civil procedure rules for how a party in a lawsuit can compel the production of documents, witnesses, and written sworn answers to questions.

. On July 2, 2014, the Tribal Council amended the Enrollment Ordinance but in so doing limited the application of the amendments to factual settings where either the Enrollment Committee or Tribal Council had failed to take action on a proposed disenrollment prior to July 2, 2014. See, Enrollment Ordinance, Section (i)(7). Here, both the Enrollment Committee and the Tribal Council had taken action on the Petitioner’s proposed disenrollment prior to July 2, 2014 making the amendments inapplicable to this matter.

. Upon this basis, the Court foregoes as unnecessary a ruling on the authorities referenced in Respondent’s Brief at page 18, lines 7-15.

. This lawsuit involves only Tribal members and Tribal government bodies as parties and concerns the interpretation of the sovereign right of a tribe to determine its own membership.

. The Petitioner was represented by competent legal counsel throughout the entire administrative process below.

. The mere size of the record below, and the number of hearings and extensions and amount of time provided for Petitioner and her counsel to make its presentation is significant.

.As previously mentioned herein, Petitioner’s bar-licensed attorneys are professionally restricted from contacting certain types of Tribal representatives without advance notice and consent from the Tribal legal representatives.